**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barbara Flint, | No. CV-13-02407-PHX-NVW |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Barbara Flint seeks review under 42 U.S.C. § 405(g) of the final decision of the Commissioner of Social Security ("the Commissioner"), which denied her disability insurance benefits and supplemental security income under sections 216(i), 223(d), and 1614(a)(3)(A) of the Social Security Act. Because the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and is not based on legal error, the Commissioner's decision will be affirmed.

**I.    BACKGROUND**

Plaintiff was born in May 1969 and was 40 years old on her alleged onset date. She has completed one year of college. From 2000 to July 2009, she worked for an insurance company in several positions, which included administrative assistant and a long term disability claims analyst. Plaintiff's neck condition began with a work-related injury in 2002. Beginning in 2005, she had three neck surgeries and a spinal cord stimulator implanted in her hip, but she continues to have pain in her neck and right

shoulder.  She began receiving short-term disability benefits in June 2009 and long-term disability benefits in January 2010.  At the time of the administrative hearing, Plaintiff continued receiving long-term disability benefits and remained an employee of the insurance company.

On August 10, 2010, Plaintiff applied for disability insurance benefits and supplemental security income, alleging disability beginning July 7, 2009.  On June 13, 2012, she appeared with her attorney and testified at a hearing before the ALJ.  A vocational expert also testified.  On July 5, 2012, the ALJ issued a decision that Plaintiff was not disabled within the meaning of the Social Security Act.  The Appeals Council denied Plaintiff's request for review of the hearing decision, making the ALJ's decision the Commissioner's final decision.  On November 22, 2013, Plaintiff sought review by this Court.

## II.    STANDARD OF REVIEW

The district court reviews only those issues raised by the party challenging the ALJ's decision.  *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001).  The court may set aside the Commissioner's disability determination only if the determination is not supported by substantial evidence or is based on legal error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  Substantial evidence is more than a scintilla, less than a preponderance, and relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole.  *Id.*  In determining whether substantial evidence supports a decision, the court must consider the record as a whole and may not affirm simply by isolating a "specific quantum of supporting evidence."  *Id.*  As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted); *accord Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) ("Even when the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record.").

Harmless error principles apply in the Social Security Act context. *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir. 2012). An error is harmless if there remains substantial evidence supporting the ALJ's decision and the error does not affect the ultimate nondisability determination. *Id.* The claimant usually bears the burden of showing that an error is harmful. *Id.* at 1111.

## III.    FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To determine whether a claimant is disabled for purposes of the Social Security Act, the ALJ follows a five-step process. 20 C.F.R. § 404.1520(a). The claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

At the first step, the ALJ determines whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If so, the claimant is not disabled and the inquiry ends. *Id.* At step two, the ALJ determines whether the claimant has a "severe" medically determinable physical or mental impairment. § 404.1520(a)(4)(ii). If not, the claimant is not disabled and the inquiry ends. *Id.* At step three, the ALJ considers whether the claimant's impairment or combination of impairments meets or medically equals an impairment listed in Appendix 1 to Subpart P of 20 C.F.R. Pt. 404. § 404.1520(a)(4)(iii). If so, the claimant is automatically found to be disabled. *Id.* If not, the ALJ proceeds to step four. At step four, the ALJ assesses the claimant's residual functional capacity and determines whether the claimant is still capable of performing past relevant work. § 404.1520(a)(4)(iv). If so, the claimant is not disabled and the inquiry ends. *Id.* If not, the ALJ proceeds to the fifth and final step, where he determines whether the claimant can perform any other work based on the claimant's residual functional capacity, age, education, and work experience. § 404.1520(a)(4)(v). If so, the claimant is not disabled. *Id.* If not, the claimant is disabled. *Id.*

At step one, the ALJ found that Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2015, and that she has not engaged in

substantial gainful activity since July 7, 2009, the alleged onset date.  At step two, the ALJ found that Plaintiff has the following severe impairments:  obesity, cervical degenerative disc disease status post fusion in 2008, right shoulder osteoarthritis, hypertension, bilateral carpal tunnel syndrome, and history of regional complex pain syndrome.  At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

At step four, the ALJ found that Plaintiff:

> has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can occasionally lift/carry 10 pounds; stand/walk 6 hours in an 8 hour workday; sit 6 hours in an 8 hour workday; she can occasionally push/pull with her right upper extremity; no climbing of ladders, ropes or scaffolds; occasional ramps and stairs; she can occasionally balance, stoop, crouch and crawl; she can frequently kneel; occasional reaching overhead with her right upper extremity; avoid concentrated exposure to extreme heat and cold and excessive vibration; avoid all exposure to dangerous machinery with moving mechanical parts and unprotected height; and she can frequently handle and finger with her dominant right hand.

The ALJ further found that Plaintiff is capable of performing past relevant work as a policy administrator, claims examiner, insurance clerk, and administrative assistant.

## IV.   ANALYSIS

### A.   The ALJ Did Not Err in Weighing Medical Source Opinion Evidence.

#### 1.   Legal Standard

In weighing medical source opinions in Social Security cases, the Ninth Circuit distinguishes among three types of physicians:  (1) treating physicians, who actually treat the claimant; (2) examining physicians, who examine but do not treat the claimant; and (3) non-examining physicians, who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  The Commissioner must give weight to the treating physician's subjective judgments in addition to his clinical findings and interpretation of test results.  *Id.* at 832-33.  Where a treating physician's opinion is not

contradicted by another physician, it may be rejected only for "clear and convincing" reasons, and where it is contradicted, it may not be rejected without "specific and legitimate reasons" supported by substantial evidence in the record.  *Id.* at 830; *Orn v. Astrue*, 495 F.3d 625, 632 (9th Cir. 2007) (where there is a conflict between the opinion of a treating physician and an examining physician, the ALJ may not reject the opinion of the treating physician without setting forth specific, legitimate reasons supported by substantial evidence in the record).

Further, an examining physician's opinion generally must be given greater weight than that of a non-examining physician.  *Lester*, 81 F.3d at 830.  As with a treating physician, there must be clear and convincing reasons for rejecting the uncontradicted opinion of an examining physician, and specific and legitimate reasons, supported by substantial evidence in the record, for rejecting an examining physician's contradicted opinion.  *Id.* at 830-31.

The opinion of a non-examining physician is not itself substantial evidence that justifies the rejection of the opinion of either a treating physician or an examining physician.  *Id.* at 831.  "The opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record."  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).

Factors that an ALJ may consider when evaluating any medical opinion include "the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; [and] the specialty of the physician providing the opinion."  *Orn*, 495 F.3d at 631.  The ALJ may discount a physician's opinion that is based only the claimant's subjective complaints without objective evidence.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004).  The opinion of any physician, including that of a treating physician, need not be accepted "if that opinion is brief, conclusory, and inadequately supported by clinical findings."  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219,

1228 (9th Cir. 2009).  An ALJ may reject standardized, check-the-box forms that do not contain any explanation of the bases for conclusions.  *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012).

Generally, more weight should be given to the opinion of a treating physician than to the opinions of physicians who do not treat the claimant, and the weight afforded a non-examining physician's opinion depends on the extent to which he provides supporting explanations for his opinions.  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014).  The Commissioner is responsible for determining whether a claimant meets the statutory definition of disability and does not give significance to a statement by a medical source that the claimant is "disabled" or "unable to work."   20 C.F.R. § 416.927(d).

### 2.    Treating Pain Specialists

Plaintiff contends the ALJ erred by giving minimal weight to the opinions of treating pain specialists Michael Minehart, M.D. and Asim Khan, M.D.  It appears that Dr. Minehart treated Plaintiff in California from March 11, 2011, through August 4, 2011, and Dr. Khan treated Plaintiff in Arizona from November 21, 2011, through the date of hearing in June 2012.

On December 1, 2010, Dr. Minehart completed a form for long term disability insurance on which for "current physical, mental and cognitive limitations and work activity restrictions," he stated "no heavy lifting 20 lbs" without further explanation or any additional limitations.  The form indicates that he began treating Plaintiff on November 24, 2010, but the record shows that neurologist Dr. Lancelot Alexander referred Plaintiff to Dr. Minehart on November 24, 2010, for a possible series of cervical blocks to better control her right arm pain.  Dr. Alexander wrote that if the blocks did not relieve her pain, Plaintiff may need a cervical spine cord stimulator for better pain control and to allow Plaintiff to lessen her long-term narcotic dependency.  Dr. Alexander's notes regarding his physical examination include observing that Plaintiff's neck showed "some reduction in range of motion in flexion and extension, and mild to moderate reduction in

horizontal rotation bilaterally." Dr. Alexander's motor exam showed "normal muscle power, bulk, and tone in all extremities." Because the record indicates that Dr. Minehart first saw Plaintiff on March 11, 2011, any opinion by Dr. Minehart dated December 1, 2010, is not supported by the record. Moreover, if it was based on his review of Dr. Alexander's referral, it would be entitled to no weight as it is a brief, conclusory opinion of a non-examining physician without any supporting explanation.

On December 15, 2010, Dr. Minehart certified Plaintiff's application for a California temporary disabled person placard (valid for six months) and described Plaintiff's impaired mobility as due to "limited use of [right] hand and to nerve injury in neck." On January 20, 2011, Dr. Minehart completed a treating physician medical source statement in which he opined that Plaintiff could carry a maximum of less than ten pounds, could stand/walk less than two hours in an eight-hour workday, and could not sit without alternating sitting and standing. He also stated that Plaintiff had weakness of her right upper extremity from pain and was "unable to hold a pen." The ALJ found that Plaintiff's medical records did not establish a significant change in her condition to explain why on December 1, 2010, she could lift twenty pounds, but on January 20, 2011, she could lift no more than ten pounds. The ALJ also found the medical records did not support Dr. Minehart's opinion that she was limited to standing/walking less than two hours. In fact, the record does not support finding that Dr. Minehart had any personal knowledge of Plaintiff's limitations on January 20, 2011.

In June 2011, Dr. Minehart completed another form for long term disability insurance, in which he stated that Plaintiff's current limitations were no lifting more than five pounds and "cannot turn head at right side." The ALJ found that these opinions lacked objective support, were inconsistent with Dr. Minehart's earlier opinions, and appeared to be based on Plaintiff's subjective complaints. Moreover, the ALJ found that being unable to turn her head would be inconsistent with Plaintiff retaining a driver license because turning her head is necessary for the safe operation of a motor vehicle.

On July 28, 2011, Dr. Minehart performed a five-level cervical facet denervation on Plaintiff.  On August 4, 2011, Dr. Minehart reported that Plaintiff was able to turn her neck toward the left side and the right side, and she had "slight tenderness over the shoulder area where the injections and needles were placed."  He noted that her pain syndrome of the right upper extremity was responding well to spinal cord stimulation.  He also wrote that the plan was for her to follow up on a monthly basis, continue her prescriptions, and gradually wean off morphine sulfate.  The record does not show that Plaintiff received any treatment between August 4, 2011, and November 21, 2011.

On November 21, 2011, Dr. Khan of the Arizona Pain and Spine Institute began treating Plaintiff for chronic neck pain.  He noted that he explained to Plaintiff that he does not like to use narcotics long term in patients with chronic pain syndromes because of tolerance, dependence, and increased sensitivity to pain.  Dr. Khan said his goal was to improve pain and function while minimizing Plaintiff's reliance on narcotics.  He further noted that Plaintiff seemed to have a tolerance to the narcotic medications she had been taking and may need a "drug holiday."  He prescribed Topamax for her migraines and oxymorphone to replace the morphine sulfate and hydrocodone she had been taking.  He reported that Plaintiff described constant pain, radiating from the neck to the right arm and hand, but she denied any intermittent associated numbness, tingling, and weakness in the right arm and hand.  On December 5, 2011, nurse practitioner Linda Milam saw Plaintiff and noted she reported the Topamax made her very lethargic but provided more pain relief, and Plaintiff had been able to reduce the morphine sulfate from three times to two times per day.

On December 7, 2011, Dr. Khan performed an electrodiagnostic study from which he found evidence of denervation changes from a moderate carpal tunnel syndrome on the right and mild on the left.  He referred Plaintiff to a hand surgeon for carpal tunnel syndrome.

On January 16, 2012, family nurse practitioner Eva Lim noted that Plaintiff said she could not afford the copayment for the oxymorphone prescription and had refilled the

hydrocodone.  On February 3, 2012, FNP Lim prescribed a fentanyl patch to control pain.  On February 8, 2012, FNP Lim noted that Plaintiff said she could not afford the copayment for the fentanyl patch, so FNP Lim replaced the fentanyl prescription with one for methadone and also discontinued the Topamax prescription.

On March 12, 2012, Dr. Kahn noted Plaintiff was off morphine sulfate, taking methadone, and not reporting any side effects.  On March 26, 2012, Dr. Kahn noted Plaintiff's neurological exam was grossly normal but limited by pain on the right side.  Dr. Kahn administered a series of cervical epidural steroid injections on April 5, 12, and 26, 2012.

On June 4, 2012, Dr. Khan completed a physical residual functional capacity questionnaire in which he reported that Plaintiff's "right arm and hand has tingling, numbness, right arm weakness, low back and leg pain (right)," and "Patient described the pain as throbbing, stabbing which is worsened with any movement and increased activity."  When asked to identify the clinical findings and objective signs, Dr. Khan wrote:  "The patient appears to be suffering from discogenic axial neck pain, x-ray of the C-spine does have [degenerative disc disease] and a fusion."  When asked how often Plaintiff's experience of pain and other symptoms is severe enough to interfere with attention and concentration needed to perform even simple work tasks, Dr. Khan selected the response "constantly."  He further opined that Plaintiff is incapable of even "low stress" jobs because of chronic pain and fatigue.  Regarding functional limitations, Dr. Khan opined that Plaintiff can walk less than one block without rest or severe pain, can sit only thirty minutes at one time, can stand one to two hours at one time, and can sit and stand/walk a total of less than two hours in an eight-hour working day.  He also opined that every fifteen to twenty minutes during an eight-hour working day Plaintiff would need to walk for ten minutes.  He further opined that every 45 minutes she would need to take a fifteen-minute unscheduled break.  Dr. Khan opined that Plaintiff was likely to be absent from work as a result of impairments or treatment more than four days per month.  He also said that the earliest date for which his description of Plaintiff's symptoms and

limitations applied was November 2011.  On June 7, 2012, Dr. Khan noted that he spent 20 minutes going over Plaintiff's paperwork with her.

The ALJ stated she gave minimal weight to Dr. Khan's opinions because they were based on Plaintiff's subjective complaints, they were contradicted by credible evidence, and Dr. Khan failed to provide a medically supported reason for many of the limitations opined.  In fact, when the questionnaire expressly asked for clinical findings, Dr. Khan said only that Plaintiff appears to be suffering from neck pain and that an x-ray showed degenerative disc disease, neither of which as described support any limitation.

### 3.     Treating and State Agency Physicians

Plaintiff contends the ALJ erred by failing to consider opinions of treating neurosurgeon Dr. Michael Sandquist and by relying on the opinions of the State agency physicians because they misinterpreted Dr. Sandquist's March 15, 2010 letter as opining that Plaintiff could perform sedentary work.  Although materials related to Plaintiff's long-term disability insurance claim refer to "Dr. Sandquist's 01/18/10 assessment," the record here does not include an assessment dated January 18, 2010, or any other medical source statement or functional analysis from Dr. Sandquist.

The record shows that Plaintiff received treatment from Dr. Walter Buhl and Dr. Elizabeth Callaghan of Northwest Primary Care Group from September 2007 through July 2010, who referred Plaintiff to Dr. Sandquist of Microneurosurgical Consultants, PC.  The record includes Dr. Sandquist's treatment notes from July 2008 through August 2010.  In July 2008 Dr. Sandquist noted that Plaintiff had a history of pain and headaches and the July 2008 cervical spine MRI was generally similar to one from December 2004.  In October 2008 Dr. Sandquist noted a CT scan of the cervical spine showed a mild bony encroachment on the left at C5-6 due to degenerative disease of the left uncovertebral joint and no other abnormality.  He identified the reason for the exam as "neck pain, headaches and muscle spasms."   In December 2008 Dr. Sandquist reported to Dr. Callaghan that six weeks after C5-6 arthroplasty and C6-7 anterior cervical discectomy and fusion Plaintiff was doing quite well overall.  He explained that Plaintiff's "neck pain

had essentially almost completely resolved compared with her preoperative pain" until she fell on ice. Since then she had had some soreness, but still thought she felt better than preoperatively. Dr. Sandquist wrote Plaintiff a release to return to work half-time for two weeks.

On July 9, 2009, Plaintiff saw Dr. Buhl for a two-day history of "steady symptoms with her right neck and trapezius spasming and hurting." Dr. Buhl noted that Plaintiff had seen Dr. Sandquist the previous week, and he "had ordered EMG for these very symptoms so he is definitely involved in this particular therapy." Although Dr. Buhl found no neuro deficit and only one specific indicator of carpal tunnel syndrome, he wrote Plaintiff a note specifying that he was "taking her off work as of today." He also recommended that she begin physical therapy, but subsequently Dr. Sandquist postponed that until after surgery. On July 23, 2009, Dr. Callaghan noted that she completed Family Medical Leave Act forms for Plaintiff to be off work for three to four weeks and wrote Plaintiff a prescription for a refill of hydrocodone.

On November 11, 2009, Plaintiff underwent surgery again with Dr. Sandquist for a right C7-T1 foraminotomy. On December 10, 2009, Dr. Sandquist wrote that Plaintiff could return to work as of December 21, 2009, working half-days and increasing to full time as tolerated. He also said she was to limit repetitive lifting, pushing, and pulling to less than ten pounds.

On February 9, 2010, Plaintiff saw Dr. Kevin J. Jamison of Oregon Neurology for right arm pain. He described her as an "uncomfortable-appearing woman with dramatic pain behaviors." She reported severe pain in the anterior right trapezius area, but not significant cervical pain. Dr. Jamison observed normal bulk, tone, and strength in her bilateral upper and lower extremities. He provided the following assessment:

> Dramatic pain syndrome involving the entire right arm with painful area centered in the trapezius and in the hand. Her overall presentation is most compatible with a functional pain disorder or at least extensive embellishment. There is no clinical sign for complex regional pain

syndrome.  Aside from the focality of her symptoms there are features to suggest a myofascial pain syndrome.

In a letter dated March 15, 2010, Dr. Sandquist wrote that Plaintiff "underwent a physical capacities examination as to whether or not she thinks she is able to perform her job or any job in the sedentary category with her current amount of pain" followed by the statement, "The pain is obviously subjective, but I would agree with this assessment." He did not say that he had seen the results of the physical capacities examination and agreed with the consultant's assessment.  Although the term "this assessment" is ambiguous, it is preceded by the phrase "whether or not she thinks she is able to perform her job" which implies that Dr. Sandquist was referring to Plaintiff's assessment.  It can be presumed, although he did not clearly say so, that Plaintiff thought she was not able to perform her job or any job in the sedentary category.  Dr. Sandquist agreed with Plaintiff, based on her subjective complaints, which he discussed with her that day "at length." But Dr. Sandquist's letter is not an opinion regarding Plaintiff's functional capacity, nor is it based on any observations or clinical findings.  The ALJ was not required to identify every document in the record she considered, nor was she required to give specific and legitimate reasons for not giving great weight to Dr. Sandquist's comment regarding Plaintiff's subjective pain affecting her ability to work.  Moreover, an ALJ is not required to acknowledge a medical source's opinion that a claimant is unable to perform a job, which is a determination reserved to the Commissioner.

State agency physicians reviewed Plaintiff's records and gave opinions in November and December 2010 and in March 2011.  The December 2010 opinion updated one given in November 2010 with additional medical records and agreed with the November 2010 opinion.  The November 2010 assessment concluded that Plaintiff was capable of sedentary work with postural and manipulative restrictions.  It did not expressly rely on Dr. Sandquist's comment, but among "significant objective findings" it identified: "3/15/10 Providence Primary Clinic.  MD Visit.  Pain subjective, capable of SED work."  It is unclear whether "capable of sedentary work" is the reviewer's

conclusion or the reviewer's interpretation of Dr. Sandquist's letter. The "significant objective findings" also included: "6/10 Clmt submit evidence. PT MSS. SED w/ manipulation of RUE," but the record does not include a medical source statement dated June 2010. The March 2011 opinion rejected Dr. Minehart's January 2011 opinion that Plaintiff was capable of less than sedentary work as "too restrictive compared to medical records in file." The State agency physicians may have misinterpreted Dr. Sandquist's comment, but there is no evidence to support finding they would have reached a different conclusion if they had interpreted his comment as meaning capable of less than sedentary work.

The ALJ gave great weight to the opinions of the State agency physicians because they had reviewed Plaintiff's records and were familiar with the relevant Social Security disability rules and regulations. Many of the other opinions included in this record were submitted for Plaintiff's disability insurance claim and primarily stated conclusions regarding whether Plaintiff could perform full-time sedentary work, which is a determination reserved to the Commissioner. Plaintiff contends that the State agency physicians did not review her records after March 2011, such as those regarding carpal tunnel syndrome and hip pain after implantation of the spinal cord stimulator, but Plaintiff bore the burden of proving disability beginning on her alleged onset date, July 9, 2009, and she did not amend her alleged onset date as a result of developments after March 2011. Moreover, Plaintiff has not shown that her functional capacity significantly deteriorated after March 2011.

### 4.    Other Sources

On February 24, 2010, Lawrence Andes, PT, of Providence Rehabilitation Services performed a two-hour physical capacity evaluation. Mr. Andes noted that Plaintiff "displayed moderate and frequent pain behaviors in the forms of grunting, wincing, verbal reports of pain, changing positions, taking occasional rest breaks, keeping her right arm held close to her side, and moving stiffly." He found that Plaintiff was not capable of work in the sedentary range of physical demand as defined by the U.S.

Department of Labor because she needed to alternate sitting and standing frequently and could perform only minimal overhead reaching, repetitive forward reaching with the right arm, bending, twisting, squatting, and kneeling.  He was not able to test how long Plaintiff could sit, stand, or walk, but drew conclusions from her diagnosis, observed behavior, and subjective report.  Mr. Andes opined that Plaintiff could sit for two hours, stationary stand for two hours, and move or walk about for four hours in an eight-hour day.

A physical therapist is not an acceptable medical source, and a physical therapist's statement is not a medical opinion.  *See* 20 C.F.R. §§ 404.1513(a), 404.1527(a)(2).  The ALJ gave Mr. Andes' evaluation no weight because it was performed by an unacceptable medical source.  Moreover, standards used for private long-term disability insurance are not equivalent to those applied under the Social Security Act.

On July 28, 2010, Mark Shih, M.D., consulting rehabilitation specialist, reviewed Plaintiff's medical records and opined that the conclusions of Mr. Andes' physical capacity evaluation were valid.  He further opined that Plaintiff was "reasonably incapable of sedentary level work on a full-time basis with any reasonable continuity as of 01/18/2010 and forward, pending improvement."  The ALJ gave Dr. Shih's opinion no weight because it did not consider all of Plaintiff's medical records, credibility, and activities of daily living and because Dr. Shih did not appear to have a treatment relationship with Plaintiff.

Therefore, substantial evidence supports finding that the ALJ provided specific, legitimate, clear, and convincing reasons for giving minimal weight to the treating physicians' contradicted opinions, great weight to the opinions of the State agency physicians, and no weight to the opinions of Mr. Andes and Dr. Shih.

## B.      The ALJ Did Not Err in Evaluating Plaintiff's Credibility.

In evaluating the credibility of a claimant's testimony regarding subjective pain or other symptoms, the ALJ is required to engage in a two-step analysis:  (1) determine whether the claimant presented objective medical evidence of an impairment that could

reasonably be expected to produce some degree of the pain or other symptoms alleged; and, if so with no evidence of malingering, (2) reject the claimant's testimony about the severity of the symptoms only by giving specific, clear, and convincing reasons for the rejection. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). In making a credibility determination, an ALJ "may not reject a claimant's subjective complaints based solely on a lack of objective medical evidence to fully corroborate the claimant's allegations." *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1227 (9th Cir. 2009) (internal quotation marks and citation omitted). But "an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." *Id.*

First, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms. Second, the ALJ found Plaintiff's statements regarding the intensity, persistence, and limiting effects of the symptoms not credible to the extent they are inconsistent with the ALJ's residual functional capacity assessment. The ALJ specifically found incredible: (1) Plaintiff's claim of total inability to use her right arm because there was no evidence of severe atrophy; (2) Plaintiff's claim of randomly falling asleep due to her medication because she did not report it to her doctors; (3) Plaintiff's claim of frequent and severe headaches because it is not supported by Plaintiff's medical records; and (4) Plaintiff's claim of losing her balance and falling several times because there are no supporting objective findings.

On October 25, 2010, Plaintiff completed an Exertion Questionnaire. She said she was living in her cousin's house in Simi Valley, California, so that she could get help from other roommates and family. She said every day she showered, dressed, and tried to walk outside for a block or so. She reported that chronic neck and arm pain prevented her from lifting more than ten pounds, housecleaning, and doing yard work. She said she attempted to wash two loads of laundry each week, but it caused pain for at least two more days. At least once a week she drove to the grocery store where she spent 45–60

minutes shopping.  She said she had difficulty opening heavy doors and other things.  She said she wore a compression sleeve on her right arm or a splint all the time to reduce swelling and improve blood circulation.  She reported that she drove a car, but scheduled her medical appointments in the morning before taking medications.  On a separate form dated October 27, 2010, Plaintiff reported that she woke up with numb hands daily, began her day with pain of 3–4/10, and ended some days with pain of 9/10.  She said she had not gone without pain for more than a few hours every day.  She also reported having treatment four days a week and depending on family and friends for opening, carrying, and driving when it was not safe for her to drive, lift, or carry things.

On March 4, 2011, Plaintiff reported that her condition had become worse in January 2011, she was losing use of her right arm with continuous throbbing and chronic pain, she wore a brace and a sling on her right arm all the time, and she used her left arm for everything.  She said she needed assistance with grocery shopping, opening jars and cans, lifting anything more than ten pounds, driving, and cleaning house.  She said she experienced "throbbing, aching, sharp, and shooting with burning sensation and numbness of my right upper extremity."  She also reported, "My pain is 8 using 1–10 verbal pain scale analog, made worse when I'm exposed to any cold weather, lifting, moving my hand, slightly relieved when I lye [sic] down, applying heat or ice."  She also said she was experiencing frequent migraines from chronic neck and right arm pain.  She identified a number of medications she was currently taking, including morphine and hydrocodone, and indicated that most of them caused her drowsiness.

On June 13, 2012, at the administrative hearing, Plaintiff testified that she lives alone in an apartment in Glendale, Arizona, but her sister and friend drive her places, and her friend cleans Plaintiff's apartment monthly.  She wore a sling and brace on her right arm at the hearing, which she said she wears daily because doing so reduces pain in her neck and right arm.  She said she does not do housework, but she prepares simple meals and cleans up afterward.  Plaintiff's friend or sister takes her shopping, but Plaintiff does not do too much because she gets tired.  She said she had started going to church again.

Plaintiff also testified that she can use her right hand to do some things, but doing so makes it hurt more.  She said she can use her left hand to carry a gallon of milk, but carrying anything pulls on her neck.  She said she gets stiff sitting more than 15 minutes without standing and she can walk about a block before she needs to take a break.  She said it is too hard to use a computer, but she uses her phone "some" with her left hand.  She testified that she can dress without assistance and friends come to take her to the store.  She said she does not drive because she could get arrested for driving under the influence of narcotics and she does not want to put people in danger.  She also testified that her medication interferes with her ability to focus and concentrate.  She said that if she wants to remember something, it helps to write it down before taking medicine.  She said she gets migraine headaches from the tension in her neck at least every other week and each episode lasts a couple days.

Plaintiff testified that she falls asleep randomly as a result of her medications, which include methadone, Topamax, gabapentin, and a sleep medication.  She said she sleeps a lot and takes a few naps during the day.  She said it is the medication that makes her tired.  She reported falling asleep and falling or dropping things as a result.  The ALJ questioned why Dr. Kahn noted she was stable on a regimen of medications without any side effects if she was constantly sleepy.  Plaintiff responded that she has told Dr. Kahn that "he needed to start making better notes, because they were not accurately documenting our conversations."  Dr. Kahn's treatment notes for June 7, 2012, one week before the administrative hearing, include:

> She has chronic low back pain and leg pain and she is concerned about her pain in her low back and legs but her primary pain is in her neck.  Her neuro exam is grossly normal at this time.  I will have her decrease her Elavil because it is too strong.
>
> . . . .
>
> I have explained to the patient that I do not like to use narcotics longer term in patients with chronic pain syndromes because of tolerance, dependence, and opioid induced hyperalgesia [*i.e.*, increased sensitivity to pain].  The

patient understands and agrees.  She has been stable on her regimen of meds and we will continue it for now in regards to her methadone.

. . . .

6/7/12.  Common side effects of the patient's pain medications were discussed and all of the patient's questions were answered.  The patient has been instructed to call with all questions and concern[s].  There are no signs of any deleterious side effects (somnolence, constipation, respiratory depression) and should any of these occur the patient understands to stop the pain meds immediately and contact our office or report to the ED.  The patient's function and quality of life appear to be improved with the use of the prescribed pain medications.

. . . .

She has been stable on her regimen of meds at this time and she is not having any side effects.  . . .  She states that she has been sleeping better but she states that [the Elavil] may be too strong because she fell asleep on the toilet at night and fell and she bruised her arm.  She continues to use her pain meds and she denies any side effects.

During the hearing, the ALJ also asked Plaintiff whether she was using marijuana because her records showed a urine drug test positive for THC.  Plaintiff said she smoked marijuana on one occasion because Dr. Kahn's nurse made her "go through withdrawals without having medicine for six days."  She said her medication was changed, the new medication was not readily available, and as a result she went without narcotics for six days.  She said she experienced painful shakes, hives, sweats, and twitching from the withdrawal, and she smoked some of her neighbor's pot.  Records show that Plaintiff saw family nurse practitioner Eva Liza Lim in Dr. Kahn's office in January 2012, who told Plaintiff to taper down her use of hydrocodone.  On February 3, 2012, FNP Lim prescribed a fentanyl patch.  On February 8, 2012, Plaintiff saw FNP Lim to change her medications because she could not afford the copayment for the fentanyl patch.  FNP Lim replaced the prescription for fentanyl with a prescription for 15 days of oral methadone on February 8, 2012, called Plaintiff on February 10, 2012, and noted on February 10, 2012, that Plaintiff was "doing well with her medication, c/o mild itching but otherwise doing well."  The notes also state Plaintiff was to follow up in two weeks, but the record

does not show another office visit with Dr. Kahn or FNP Lim in February 2012.  On March 5, 2012, Plaintiff saw family nurse practitioner Heather Chung at a different pain management clinic.  FNP Chung noted that Plaintiff stated she was currently with Dr. Kahn in Mesa, "does not feel this pain management is helping with her needs," and "she has been running out of her medications with this office because she is being prescribed medications that are not in store at the pharmacy."  FNP Chung also documented that Plaintiff was a former smoker and "Drug use:  marijuana."  On March 12, 2012, Plaintiff saw Dr. Kahn, and his treatment notes state:  "She states that she has been off of her [morphine sulfate] and she has been on methadone and she states that she is not having any side effects from her meds at this time."  The March 12, 2012 notes indicate that a prescription for 30 days of methadone was written.  The drug test performed on March 26, 2012, revealed methadone and THC.

Records from Northwest Primary Care Group indicate that Plaintiff was seen by Dr. Callaghan in September 2008 for migraine headaches, and she has been prescribed medication for migraines, but they do not include any explanation or further information.  The record does not show that Plaintiff reported an increase in frequency or severity of migraine symptoms in mid-2009 or sought additional treatment for migraines.

Thus, substantial evidence supports finding that the ALJ provided clear and convincing reasons for partially discrediting Plaintiff's subjective symptom testimony.

### C.    The ALJ Did Not Err in Weighing Third-Party Reports.

The ALJ found the opinions of Plaintiff's friends and family credible only to the extent they are consistent with the ALJ's decision because "[t]he opinions asserted are not based on personal knowledge but instead are based on what the claimant has told them."  In other words, the ALJ did not reject the third-party opinions entirely, but only discounted them to the extent they conflicted with other evidence.

The ALJ considered statements by Plaintiff's friend Ms. Luth, Plaintiff's sister Ms. Flint, and Plaintiff's neighbors Mr. Garth and Ms. Mitchell.  Ms. Luth stated she helps Plaintiff with housecleaning and drives her to medical appointments and grocery

shopping.  Ms. Luth opined, "Barbie cannot do it by herself without causing her pain to get worse and then she gets migraines if she overdoes anything."  Ms. Flint stated that she and their mother moved here to help with her sister's needs, her sister used to be active and full of energy, and "now she is in so much pain, her life is very limited."  Mr. Garth said he had seen others do simple chores for Plaintiff and, "To me she seems to be in pain just walking outside, which is seldom."  Ms. Mitchell was a little more specific, stating that she had "watched her wince in pain from moving to try and reach something on a counter," and "she has had difficulty getting in and out of my car."  Ms. Mitchell also referred to having seen Plaintiff in pain and said, "Barb was in pain when trying to do the smallest task."

When an ALJ discounts the testimony of lay witnesses, he or she must give reasons that are germane to each witness.  *Valentine v. Comm'r of Soc. Sec.*, 574 F.3d 685, 693-94 (9th Cir. 2009).  Here, the ALJ stated that the four opinions were not based on personal knowledge, but rather on what Plaintiff told them.  The ALJ gave as an example Ms. Luth's statement that Plaintiff "cannot clean or grocery shop on her own without causing her pain to worsen."  Ms. Luth could not actually know whether Plaintiff's pain worsened after cleaning or shopping because she could not feel Plaintiff's pain, so Ms. Luth had to rely on Plaintiff's explanation for why Plaintiff needed Ms. Luth's assistance with cleaning and shopping.  The ALJ correctly stated that the other opinions were similar.  To the extent that the third-party opinions merely repeated Plaintiff's pain testimony, they could not bolster Plaintiff's credibility, and they added nothing useful for the ALJ's decision.  If the opinions had included more personal observations regarding Plaintiff's functional capacity, they likely would have been more useful.  The ALJ also found the statements to be only partially credible because they claimed limitations not fully supported by Plaintiff's records and because the sources were not qualified to opine regarding Plaintiff's impairments or ability to perform work activity.  That is, the friends and family were not qualified to opine that Plaintiff *cannot*

do certain activities, only that she *does not* do them.   Thus, the ALJ gave reasons germane to each witness for partially discounting the third-party opinions.

IT IS THEREFORE ORDERED that the final decision of the Commissioner of Social Security is affirmed.   The Clerk shall enter judgment accordingly and shall terminate this case.

Dated this 1st day of December, 2014.

Neil V. Wake
United States District Judge